ANNA M. HIERONIMUS *et al.* Appellees, *vs.* MICHAEL B. MORAN *et al.* Appellants.

*Opinion filed February 16, 1916—Rehearing denied April 6, 1916.*

1. BUILDING LINES—*word "bays," used in building line agreement, construed.* The word "bays," used in a building line agreement which excepts from its terms "porches, bays and ornamental projections," means bay windows, and includes a bay window the walls of which extend from the ground to the roof of a building and form extensions of rooms in each story of the building.

2. SAME—*no part of the main mass of a building can properly be termed a porch.* The words "porch," "veranda" and "portico" are synonymous, as commonly understood, and refer to structures which are not a part of the main mass of the building.

3. SAME—*what is not a porch.* A projection sixteen feet wide and extending at right angles ten feet beyond the building line, its foundation and roof being a part of the foundation and roof of the building, with walls extending from the foundation to the roof, having openings fitted with casement windows in each of the three stories and containing a room in each story which is to be finished in wood, has a mosaic floor and is supplied with radiation, is not within the meaning of the word "porch," as used in a building line agreement.

APPEAL from the Circuit Court of Cook county; the Hon. THOMAS G. WINDES, Judge, presiding.

BOLTON & MORIARTY, (MAURICE J. MORIARTY, of counsel,) for appellants.

W. T. ALDEN, C. R. LATHAM, and H. P. YOUNG, (T. A. SHEEHAN, of counsel,) for appellees.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Appellees, as owners of certain lots situated in William Turkinson's boulevard and park re-subdivision of block 9 of Drexel & Smith's subdivision of the west half of the northwest quarter and the west half of the west half of the southwest quarter of section 11, township 38 north, range 14, east of the third principal meridian, filed their bill in the circuit court of Cook county against appellants, Michael B. Moran and Simon W. Strauss, as owners of lots 10 and 11 in said block, to enforce a certain building line restriction. Appellants' defense to this suit was, in substance, (1) that appellees had not observed and enforced the building line covenants before appellants became owners of their said lots and began to build, and therefore have no equitable right to have the building line restrictions enforced against appellants; (2) that appellants have substantially conformed to the requirements of said covenants by their building plans and specifications, and that their building as planned and built does not, and will not when completed, encroach upon or violate said building line agreement. The court found and decreed that appellees in the erection of buildings upon their respective lots had constructed them in compliance with the building line agreement, and that they had not abandoned or violated their said building line agreement and that it was still in full force and effect; that appellant Michael B. Moran on February 27, 1914, purchased lots 10 and 11, in said block 9, with full knowledge of the building line agreement; that on October 20, 1914, he executed and delivered to Simon W. Strauss, to secure a loan of $100,000, a trust deed thereto, and that Simon W. Strauss has no

interest in said lots other than as trustee as aforesaid; that on October 31, 1914, the said Michael B. Moran commenced constructing two three-story stone and brick apartment buildings on said lots, and that the parts of said buildings north of said twenty-foot building line on both of said lots, in so far as they are enclosed and contain glass casement windows, window frames and mullions, are in violation of the terms and restrictions of said building agreement and obstruct the light, air and view of appellees, and that he, his heirs and assigns, be and are forever enjoined and restrained from further erecting any construction or building north of said building line except porches, bays and ornamental projections, and is ordered to remove said obstructions by April 18, 1914, and pay the costs of this suit.

The building line agreement was executed on March 5, 1896, by all the lot owners then owning lots in said block 9, and was recorded in Cook county, Illinois, on April 8, 1896. The material parts of the agreement are contained in the following words and figures, to-wit:

"It is understood, covenanted and agreed that no building shall be erected upon said premises, or any part thereof, by any of the parties hereto, their heirs or assigns, extending (exclusive of porches, bays and ornamental projections,) north of a line twenty feet south of the north line of said lots 1 to 11, inclusive, above described, it being the intention of the parties hereto to hereby establish a building line of twenty feet, exclusive of porches, bays and other ornamental projections, as aforesaid, over the entire block covered by said lots 1 to 11, as above described. It is further understood, covenanted and agreed that any violation or contemplated violation of this agreement on the part of any of the parties hereto shall be subject to injunction in any court of competent jurisdiction, and that any building erected upon the north twenty feet of either of said lots in violation hereof shall be removed at the suit of any person owning any other of said lots, in ejectment or other ap-

propriate action, an easement for light, air and view being hereby created on the north twenty feet of each of said lots for the use and benefit of the owners of the other of said lots. This agreement shall be construed to run with the land, and shall be binding upon and inure to the benefit of all parties hereto and their respective heirs and assigns, owning one or more of said lots or any part thereof."

The facts in this case were largely set forth in a written stipulation, with the agreement that further evidence might be introduced by either party, and therefore there is very little dispute as to the real facts in this case.

Drexel square is a boulevard in the city of Chicago one block long, running east and west between Fifty-first street on the north and Fifty-second street on the south. It intersects at right angles Drexel avenue on the east and Cottage Grove avenue on the west, and would run into the north part of Washington park if extended west. Block 9 is situated on the south side of Drexel square and fronts north. In March, 1896, the block consisted of eleven vacant lots of the width of fifty feet each, except lot 1, which was seventy-three feet wide. Lot 1 is situated at the corner of Drexel square and Drexel avenue, and proceeding westward from lot 1 the other lots were numbered serially up to number 11, which was situated at the corner of Drexel square and Cottage Grove avenue. Original lots 4 and 5 had been further subdivided into sub-lots 1, 2, 3, 4 and 5, each twenty feet wide. The sub-lots were numbered serially, No. 1 being the west twenty feet of original lot 5 and sub-lot No. 5 being the east twenty feet of lot 4. Sub-lots 3, 4 and 5 in 1896, sub-lots 1 and 2 in 1897, the east half of lot 8 and the west half of lot 8 in 1898 and 1899, and the east half of lot 7 in 1902, were all improved with three-story stone and brick residences built on the same general plan. Parts of the front walls of those houses are on the building line, and from those parts porches project northward in distances varying from about six to eleven feet. The porches vary in

272 — 17

width from about ten to fifteen feet. The other parts of the front walls of those houses extend north over the building line in varying distances from about three and one-half to four and one-half feet, forming bay-shaped walls, some of which are circular while the others have three surfaces or faces and resemble the exterior surfaces of a half of a regular hexagon. The bay walls extend from the foundation to the top of the building and form extensions of a room in all three of the stories. There are three windows to every story, and, in fact, they are bay windows. Bay windows are expressly permitted by the building line agreement, as the word "bays" in the building line agreement evidently has reference to bay windows. A bay window is defined by the American Encyclopædic Dictionary as "a window projecting beyond the line of the front of a house, generally either in a semi-hexagon or semi-octagon," and then is explained thus: "Strictly speaking, a bay window rises from the ground or basement, while an *oriel* is supported on a corbel or brackets, and a bow window is always a segment of an arch; but in ordinary use these distinctions are seldom accurately observed, all these words being used as synonymous." "The mere fact that the bay window rises from a foundation in the ground instead of being a mere projection outward from the wall some distance above the ground does not make it any the less a bay window within the ordinary meaning of that term." (*Keith* v. *Goldsmith,* 194 Ill. 488.) The porches to said buildings are generally supported by two brick or brick-and-stone walls built from the ground on the north and west sides, and there is an entrance under the east side of the porches and between the east end of the north wall of the porches and the wall of the bays, leading into the basement through an entrance in the walls on the building line. In some of said residences the porches have three walls, and the entrances to the basements are in one of the side walls or in the wall of the bays. To all of said porches there are stone steps, most of which

have stone rails on each side leading up onto the porches to the entrances of the houses through doors on the south sides of the porches. Some of the porches are two-story porches, the upper porches being supported by columns resting on the walls around the lower porches. At the residence on the east half of lot 7 there are buttresses on each side of the stone steps, built of stone and brick, rising in sections five, six and seven feet high, respectively, above the lot level, and the steps there extend very close to the sidewalk at the north lot line. There are in some instances storerooms under the porches, and in others they form parts of the basements.

We cannot agree with appellants' contention that the building of any of the porches in the manner above indicated is a violation of the building line agreement. All porches are in some way supported by walls underneath or by pillars, and are often found closed on all sides below the first porch floor. Porches are expressly excepted in the building line agreement, and are therefore a class of structures that the agreement permits to extend north of the building line. There was no limitation as to the character or the extent of the porches that are so permitted to extend north of the building line. There can be no question about the structures just described being porches, and they are open porches that do not obstruct the easements of light, air and view, which are the only easements the contract sought to establish. The obstruction of those easements must be considered from the standpoint of the occupants while in their respective residences upon said street, and not while standing, sitting or reclining on their lawns. It is not conceivable, therefore, how the steps to the porches, the entrances to the basements and the basements or storerooms under the porches could be said to be substantial obstructions, within the meaning of the contract, to the easements of light, air and view, when it is further considered that all the porch floors in said buildings are about on the same

level, and that the porch floor in every one of said buildings is on the same level with the corresponding floor in the main building. It was said in *O'Gallagher* v. *Lockhart,* 263 Ill. 489, that an open, uncovered porch or platform, with the necessary steps and risers to afford ingress and egress to and from the dwelling, would not be in violation of a building line restriction that no building shall be erected within fifteen feet of the front line of the premises, and in that agreement porches were not excepted.

On lot 9 in 1911, and on lot 6 in 1913, three-story apartment buildings were built extending across the entire width of the lots, and were known, respectively, as the Hieronimus and Roe buildings. The main front walls of the Hieronimus building are built on the building line except at the northwest and northeast corners, where there are constructed two porches, having dimensions of a little less than eleven feet east and west by some over ten feet north and south. These porches are almost square and are three-story porches, the lower ones being each covered by the floor of the porch above it and the uppermost one having no covering. Both of the porches are open on the front and sides and project over the building line five feet and three inches and extend south of that line almost five feet. Those porches have large pillars for supports, running up slightly above the level of the third floor of the building. The front entrance to the building is between the two porches, through a vestibule or porch projecting very slightly north of the building line, which is entered by two or three stone steps. The porches are connected with the living rooms, to which they are attached by windows that open upon the porches. The lower porch has a brick balustrade about two feet high around the sides thereof and the upper porches have railings around them. Basement or underground rooms are under these porches, connected with the main basements by doors, and there is an outside entrance to the basement floors under the north front wall that is under and sup-

porting the first floor of the porch of the northeast corner of the building. The entrance is gained by stone steps leading down into the basement. The first floors of these porches, which are about six feet above the lot level, have no steps or entrances leading onto them from the outside. A porch similar in its main features to the porches on the Hieronimus building is located at the northeast corner of the Roe apartment building, about twenty-five feet in length east and west by about nine feet north and south, all of which projects from the north front wall of the building across or over the building line. This porch differs from the porches on the Hieronimus building by extending to the top of the third story and in being covered by a roof coming down from and forming apparently a part of the main roof of the building. All the floors of this porch have brick balustrades around them, about thirty inches high. The three sides of this porch are open, and are kept open all the time by express agreement of Roe with the other lot owners there, who made objections to his closing them and who had determined to take steps toward preventing the structure unless he did make it an open porch. The floors of all these porches are connected with the corresponding floors of the main building with French doors. The front entrance to the building is near the center of the front walls, through a vestibule or porch projecting less than three feet over the building line, and there are two or three stone steps leading up to it from the north. All the porches on those apartment buildings are appended to and are not parts of or contained within the main walls of the buildings. They are therefore porches within the strict meaning of that term as used in the building line agreement, and therefore do not violate the restrictions in that agreement.

It is conceded by the appellants that the apartment building on lot 1 does not violate the building line agreement, as no part of it extends north of the building line. Lots 2 and 3 and the west half of lot 7 are vacant.

The Moran structures being built on lots 10 and 11 are three-story brick apartment buildings, with the basements rising about four or five feet above the lot level. Beginning at the east line of lot 10 the front wall of the building follows the building line about eleven feet; from thence it projects at right angles ten feet and two inches, then due west sixteen feet, then south ten feet and two inches to the building line, thence west about eleven feet, then south again into a court, and around the court to lot 11. The front wall of the building on lot 11 follows similar lines on that lot, beginning on the west line thereof, having the same sized projections north of the building line. The walls of the projections of the two buildings extend from the footings of the foundations to the roof. The roofs of the projections are continuous with the roof of the main portion of the building. The walls of the projections above the foundations are thirteen inches thick. Above the basement on the east side of the first, second and third floors of the projections there are openings in the walls about six feet wide by six and one-half feet high, which are enclosed with two casement windows and window frames, with a mullion between them made of stone on the first floor and of wood on the second and third floors. On the west side of the projections the openings are the same size and enclosed in the same manner. On the north side of the projections the openings are approximately twelve and one-half by six feet, and are enclosed in the same manner with three casement windows and window frames and two mullions. The projections on each floor are divided from the main parts of the buildings on the south by three French doors and casements. The doors open into other rooms in the buildings. The plans provide that the rooms in the projections are to be finished in birch, have mosaic floors and are to be equipped with electric lights and radiation. The entire walls of the projections are built solid with stone, brick and terra cotta, except the openings aforesaid.

The projections in the Moran apartment buildings are called closed porches by appellants. It is apparent, however, that these projections are parts of the main buildings, containing separate and distinct rooms, and that they are neither bays nor porches. The evidence shows clearly, too, that they are material obstructions of air, light and view, and particularly to the occupants of the Hieronimus building, as they project more than ten feet north of the line of the main front wall of the Hieronimus building and almost five feet north of the north line of the porches on that building, and the two buildings are very close together. A porch is defined by the Century Dictionary as "an exterior appendage to a building forming a covered approach or vestibule to a doorway; a covered way or entrance, whether enclosed or unenclosed." The Encyclopedia Americana describes a porch in this language: "A covered place of entrance to a building and differentiated from its principal mass. Its forms are various, sometimes extending above by more than one story, sometimes enclosed save for the doorway, then again open to the outside on three sides, with its outer corners supported by columns or piers." The words "porch," "veranda" and "portico" are synonymous, and in this country verandas and porticoes are commonly called porches. No part of the main mass of a building may be properly called a porch.

It is argued by appellees that the court erred in not ordering the entire projections on the Moran building removed because they are structures not permitted to be built by the building agreement. No cross-errors are assigned on this record. Cross-errors must be assigned on the record before they can be considered, under rule 11 of this court. *Gage* v. *Brown*, 125 Ill. 522.

The decree of the circuit court is affirmed.

*Decree affirmed.*